MACK and others *v.* JONES.

*(Circuit Court, W. D. Tennessee.   July 6, 1887.)*

1. ATTACHMENT—FRAUDULENT CONVEYANCE—EVIDENCE—STATEMENT TO CREDITOR.

An allegation that a debtor has fraudulently conveyed, or is about fraudulently to convey, his property, is not sustained by showing a discrepancy between a statement made to another creditor, with a view of securing a credit, and the actual truth of his condition, as shown by a critical examination of his affairs, if the statement be so generally true that it fairly represents his condition. Such statements are not intended to be as precise as if made from balance-sheets in book-keeping.

2. SAME—OVERBUYING GOODS.

The allegation of a fraudulent transfer is not sustained by evidence showing that a merchant who had been successful, and was not in debt, concluded to enlarge his business, and bought imprudently perhaps more than he should have done; particularly if the creditors eagerly persuaded him to buy and encouraged his imprudence by pressing goods upon him. If his intentions were honest, his want of judgment cannot aid the attachment.

3. SAME—REMOVAL OF GOODS.

It is not evidence of a fraudulent intent to dispose of the property that a merchant removes a considerable part of his stock to another town in the same county, and opens a store there to sell them, if the proof shows that the scheme was fairly reasonable, and the purpose an honest one, to sell goods to the trade, and not to cheat his creditors.

4. SAME—FORMING A PARTNERSHIP.

It is not a fraudulent transfer of a merchant's property for which he may be attached if he places part of his stock in a partnership in a town near by, to be so sold, provided the partnership be a fair one, and the contract has an adequate and valuable consideration to support it. A transfer may be so made without implication of fraud, and is not in any proper sense out of the usual course of trade, nor does it in any proper sense hinder and delay or defraud his creditors.

5. SAME—SELLING BELOW COST.

An attachment for fraudulently disposing of his property, and being about to do so, is not sustained by proof that, in opening a new store to attract customers, a few articles are cheaply sold nearly at or below cost, the instances proved being insignificant, and fully explained by the circumstances; particularly if the fact be that the stock was generally sold at a profit, and the business was successful.

6. SAME—POLICY OF ATTACHMENT LAWS.

The attachment laws should be intelligently administered, so as to protect creditors, on the one hand, from any cunning devices to defraud them and their debtors; on the other, from an eager and oppressive greed, for a preference, inconsiderate distrust, and unwarrantable interference with a business transaction that is honest, but unsatisfactory to the creditor.

7. Removal of Causes — Attachment — Effect of Transferring Fund on Attachments not Removed.

An attachment suit, being the first levied, was removed to the federal court, the state court directing the receiver to retain so much of the fund as belonged to that suit and pay the balance into the registry of the state court, which was done. *Held,* that on the failure of the removed attachment in the federal court the defendant was entitled to the fund, and that it would not be returned to the state court to answer subsequent attachments not removed; but any surplus retained by the receiver should be by him paid under the order of the state court.

Attachment.

This is an attachment under the statute in Tennessee for having fraudulently disposed of property, or being about to do so, to which the defendant pleaded in abatement, denying the charges made. The facts appear in the opinion of the court.

*McFarland & Bobbitt,* for plaintiffs.

*Rawlins & Williams* and *M. M. Neil,* for defendant.

HAMMOND, J. A most careful reading and reconsideration of the proof has confirmed the impression left at the hearing that this attachment was unauthorized. Giving the widest scope to all that is claimed for the language of Mr. Justice STRONG in *Butler* v. *Watkins,* 13 Wall. 456, as to the latitude to be given in the admission of evidence to prove fraud, and conceding the utmost to the suggestion that often it cannot be proved by direct testimony, but only by circumstances, and yet fraud cannot be established by inconsequential circumstances and facts that are entirely consistent with honest intentions, albeit they be facts that show an unwise judgment and imprudent business conduct. Take any merchant, and especially the country merchants of this section, and subject their business conduct to hypercritical scrutiny, and circumstances will be developed showing that, in the struggle for existence that goes on among them, they violate somewhat the highest standards of business prudence. They often do not keep books that should be kept, nor proper accounts. They buy too largely; engage in doubtful speculation; enterprises that risk too far their judgment as to the future of crops and other business contingencies; and do not always, if ever, give their creditors, or proposed creditors, the most exact statements of their condition, being satisfied with generally truthful exhibits that are as full as any one expecting to deal with them has a right to expect. These statements are not intended to be exact. If so, every merchant would have to produce a balance sheet, and a complete and detailed showing of his affairs, as the preliminary to asking a credit of the wholesale dealer. Few merchants would be willing to do this, and it is not asked. Therefore discrepancies between the statements that are made and the exact showing by the books are quite probable in almost any case; as here, the statement of the defendant to Eiseman, which has been so severely scrutinized, taken in the light of his explanations is of that character. Want of precision in it is not, in my judgment, of consequence, as a circumstance showing any fraudulent intent; particularly when taken in connection with the specific transfer alleged to be fraudulent, to be

presently noticed, and in relation to which the circumstance must be considered. As a conclusive indication that it does belong to that category of unintentional misstatements, the effect of it was to cause Eiseman to refuse the credit asked, and to withhold the goods ordered. Wiser than the plaintiffs and others, whose eager drummers crowd their goods upon the defendant, Eiseman saw that he was overbuying and unwisely expanding his business upon a credit, based on a faith in the future of it that Eiseman did not share. If the defendant had conceived the fraudulent scheme to buy goods extensively on a credit, and leave his creditors in the lurch, as plaintiffs insist, the misrepresentations would have been of a character to deceive Eiseman, and the truth would not have been as nearly told as it was.

And here I wish to say that the attachment laws of Tennessee were not designed to enable merchants who crowd their sales upon reluctant or imprudent retailers to impound the goods they have so parted with, as soon as they become alarmed for the success of their debtor in his enterprise of selling them. The attachment laws are made to protect them against fraud,—specific fraud, but not imprudent business management, or that kind of imaginary fraud that they attach to insubstantial mercantile speculation which the wholesale merchant decries when it is developed in his customer, although indulged in by himself in the very transaction.

Briefly, the proof here shows that the defendant, a young man who had been a dry goods clerk, launched out for himself by buying at an insolvent assignment a stock of goods, at very low figures. To these he added other goods, and, after the year was done, he had been very successful. He did not owe a dollar, and had more and better goods than he had started with, though he had some of the old stock left. He had paid his purchases promptly, and taken the benefit of the discounts allowed for cash. He was dazed with the success, and thought he could enlarge his business. So were the drummers who lived round about him, and were his friends, every one of them. They drummed him to death; even extorting promises that he should buy only from them, respectively, they thought it was such a good thing. It is difficult to say which was most to blame,—the defendant or the drummers; but certainly those orders and promises should not be now taken to mean that the defendant had then cunningly contrived a scheme to get the goods, and pocket the money for their sales, as is now alleged, in the desperation of the desire to save this attachment; for they are wholly consistent with an honest purpose to conduct the business as successfully as before. Why should this successful young merchant conceive that scheme, at that time, rather than the more honest one of enlarging his business into a greater success? It is simply preposterous to suppose that he did. He did not owe anything, had paid for his stock on hand, and was not in the least embarrassed. The circumstances all tend to support his contention that he thought he could enlarge his business, buy on time, and have the money ready to meet his bills four months thence. He seems to have been himself somewhat alarmed at his orders, and coun-

termanded some of them. Some of the drummers accepted this, and did not send the goods; others, including the plaintiffs, said they had already shipped. But it is said he ordered from others, which is true, to some extent. He was trying to distribute his favors, no doubt, among his friends who were so eager to sell to him; but, after all, there was no such overbuying as indicated any such wickedly preconceived scheme as that alleged against him to support this attachment. His purchases were largely within $10,000, and, according to plaintiff's calculations, amounted to only $8,200, besides which he had, in goods and cash when he commenced to buy, about $4,000. He had bought during the whole year before only about $7,000 worth of new goods, but he had bought the Bryant old stock; so that, while his purchases for his fall trade were quite as much as for the whole year previously, this shows no such expansion as indicates the fraudulent purpose under consideration, however unwise it may seem.

I am inclined to think he might have worked out if his creditors had let him alone, and trusted him; for the comparison with his neighboring merchants, made in the proof, indicates that. They were bound to trust him unless he had fraudulently conveyed his property, or was about to do so when they attached. This alleged fraud of overbuying was no ground of attachment. It may have alarmed his creditors, but their alarm was not to be assuaged by seizing the goods without a statutory ground of attachment, and we can only look to these circumstances as evidence tending to convince us that some specific transfer, sworn to by the creditors, was a fraudulent one,—that is, one depriving the creditors of some just right they had, with an intent to hinder and delay or defraud them,— and these words may be taken as synonymous. Winf. Words & Phrases, 181; Bump, Fraud. Conv. (2d Ed.) 582.

The mere dissatisfaction of creditors with his business or his methods, however well founded it may have been, is no ground of attachment, and this is a mistake creditors alarmed about their customer often make. They must be able to show some specific act which is done under circumstances showing an intention to cheat them *by that act.* Other acts and circumstances may be shown in evidence, undoubtedly, and the attachment laws should be so liberally construed and administered by the courts that no amount of cunning shall be allowed to make fraud available by narrow and confined interpretation of conduct and its attendant circumstances; but, nevertheless, when a court can see that the conduct and circumstances are consistent with honest purposes, appearing in the case, the creditors should not be allowed to distort those circumstances to make them fit any real or imaginary injury to themselves which they may be pleased to denominate a "fraud." This is clearly the law in Tennessee. *Jackson* v. *Burke,* 4 Heisk. 610; *McHaney* v. *Cawthorne,* Id. 508.

It is alleged, for instance, in this bill, and urged in argument, that these goods were sold to be traded at Humboldt, and complaint is made that some of them were carried to Medina, another railroad town in the same county, to be there sold, as if this transaction were a ground of attachment, or, at least, a pregnant circumstance, showing a fraudulent

intent within itself. The statute allows an attachment for a fraudulent removal of one's property from the state, but within the state he may carry it where he pleases, and, while this circumstance may have alarmed plaintiffs, it was not wrong in itself, and no fraud can be implied from it, be it never so unwise.

Again, it is alleged that the defendant was selling the goods below cost. It is said in argument that this is hard to prove; but is this any reason why it shall be assumed? What is the proof? Only that at Medina a few pairs of shoes and one suit of clothes were sold for sums thought to be below cost. The defendant and his clerks say the goods were not sold below cost, and explain that staple goods were sold closely, and that some others as "leaders," to start their new trade at Medina, were sold occasionally at figures close to cost, but all in the legitimate way that all merchants use. When defendant's rivals complained to plaintiffs that he was selling below cost, they became alarmed, and sent down a drummer. He went to the rivals, and was told so; but these rivals are not witnesses here to prove what they told to the plaintiffs in the letter they wrote, and to the drummer when he went to investigate. It is said in argument, by way of excuse for this, that they only knew what had been told to them, and that was not competent. If it was not competent to sustain the charge, it was not sufficient as a basis for the affidavit of its truth, unless the witnesses who did know and told the facts are here produced. The suspicions of rival merchants were not a fair ground of action for plaintiffs in suing the attachment, even though plaintiffs were threatened with the loss of the custom of those merchants by the letter they wrote giving the false information that defendant was selling for 50 cents on the dollar less than the price they paid to plaintiffs; at least it was false so far as this record shows. This drummer who was sent to investigate went to these rival merchants, who were angry because defendant had opened a store in their town, and was successfully competing with them, and were evidently trying to break him down by reporting him to his creditors as selling below cost, and these conspirators set a trap to catch the defendant. The man sent to buy a suit of clothes which had been bought from the plaintiffs, the price of which was $16, succeeded in having the clerk price it to him at $14.50 "if he would not tell, and say that he paid $16.50;" and this circumstance is distorted into one showing a fraudulent intent to sustain the allegations of this attachment affidavit. So far from the proof showing that the goods were sold below cost, it shows that they were successfully sold; for, the Medina concern, not being attached, continued business successfully, and the clerk swears the goods were all sold properly, with such attractive methods of pushing trade as merchants use by selling a few articles cheaply. One of the reasons why defendant could do this was that he had part of his old insolvent sale stock, which he was working off in this way, to the consternation of his rivals. Courts cannot sustain attachments on such proof as that, however convenient they may be to merchants who have become uneasy, and wish to recover the goods they have sold.

We come now to the partnership transaction, which is the only really

v.31f.no.4—13

formidable fact in the proof. Was that a fraudulent transfer of the goods sent to Medina, and upon that fact can the truth of this attachment affidavit be sustained? The facts are that the defendant conceived a scheme of locating a branch house at that town, in the same county, which seemed a good opening. He made an arrangement with his brother, whereby he was to manage the new store in a partnership, and they hired one Shelton, an efficient clerk, there. The defendant was to put in $2,400 worth of the stock he had at Humboldt, and his brother an equal amount. This was done, part of the brother's, however, being put in after this attachment was levied on the Humboldt store. But this is not material, as the proof clearly shows that the brother carried out his part of the contract. The defendant explains, and all the circumstances corroborate him, that he knew that Medina furnished an opening for a store. He was afraid that, selling at Humboldt alone, he would not be able to sell his goods in time to meet his bills; and he thought it a good business plan to sell them at two places, instead of one, particularly as he could thereby use to advantage the old stock he had on hand, part of which he had bought at the insolvent sale. That he was doing this successfully is shown by the consternation he created among his competitors, who tried to drive him out of the town by the untrue complaints that he was selling goods below cost, already noticed. In one sense, this may have been out of the ordinary course of business, because it is not every merchant who keeps two stores, nor every one who resorts to this particular way of selling his goods; but of itself it cannot be objectionable, nor can a fraudulent intent be implied from it, when explained as this is explained. Suppose it be conceded to have been unwise, still the explanation negatives all idea of the fraudulent intent charged by this affidavit. But it does not appear to have been unwise, for this Medina business went on after the attachment of the Humboldt store, and was successfully conducted and wound up. The consideration was valuable, adequate, and fair, and the defendant lost nothing by the transaction in his ability to pay his debts. It is true his brother did not at first put in more than $900 in money, and the purchase of new stock was on the credit of the firm, but that is only a detail of the transaction which perhaps was fairly set off by the fact that defendant's contribution was in part old goods, and the brother afterwards made his part good. The defendant did not owe a cent that was due. He had bought his new stock on four months' time, and the hope was not an unreasonable one that, if he had good luck, he could meet his bills, as he had done the year before, by paying them before they became due; and yet these plaintiffs, without any cause, except those already noticed, swooped down upon him with this attachment, and seized the Humboldt goods before they were fairly opened and the fall trade commenced. This was done on the letters of rival merchants, and without any fact to sustain their statement, except that one suit of clothes had been sold for $1.50 below the marked price, and a few pairs of shoes at 75 cents which the rival merchants sold for 90 cents. At most, that is all the foundation for it shown by this record.

But it is said that the plaintiffs and other creditors were not informed of this partnership transaction, and that it was concealed from them. No doubt, it would have been wise to have informed them, but some men do not always think it necessary to give information to their creditors of all their business transactions; particularly if the debts are not due, and they are acting honestly and openly. The notion of any concealment is preposterous when it is shown that this partnership was known to his neighbors at Humboldt and Medina, that it was advertised in the county paper, and by circulars distributed all over the county soliciting trade. These plaintiffs' drummer and those of other creditors aver they did not know it; but that only shows that they did not read the papers of the neighborhood where they lived, for they all lived in that section, and were not alert, and not that the defendant was concealing the partnership, for he was not. They no doubt had confidence in a man who had been as successful as defendant, and were not watching him, and had no occasion to do so. It is said that the goods were removed to Medina secretly; but this is in keeping with the rest of the circumstances relied on to sustain this attachment, and wholly untrue. The proof is that a witness saw the goods being loaded on a wagon at the back door at 7 o'clock in the morning. They were carried openly across the country in wagons hired in the town, and were loaded at the back door for convenience. It was cheaper to thus carry them, no doubt, than by rail, and there was nothing secret about it. The reliance upon such inconsequential proof as this shows the fatal defects of plaintiffs' attachment.

It is urged that this partnership "hindered and delayed the creditors," but that is delusive. Defendant's interest in the partnership was still liable to seizure by execution, and it is a mistake to suppose that he was under any obligation to his creditors not to enter into any partnership or other business transactions without their consent, or one that would deprive them of "a direct levy," to use the language of counsel. He might make any transfer that was honestly made, for a valuable consideration. Bump, Fraud. Conv. 582 *et seq.*

The very worst thing that has been shown against the defendant is that when he wound up his interest in this Medina store, and got out his share of the partnership, he kept the money, only paying a debt due to his mother, and did not pay his creditors. The highest type of man would, perhaps, have paid this money to those creditors, at least, who had not attached; but a good deal of allowance must be made for the resentments and temptations of human nature. This cruel attachment had destroyed defendant's means of living, had taken away his goods, and shattered his business hopes and prospects, and under the circumstances it cannot be said that his failure to apply the money to his debts indicates that this affidavit for attachment was true at the time it was filed, and this is the test. *Bamberger* v. *Gerson,* 24 Fed. Rep. 257.

Of course, it is apparent that the argument that defendant is insolvent, that the fund in court is the only reliance of plaintiffs to collect their debt, and that it is the product of the sale of the goods they had sold to him, in part, if not wholly, cannot avail the plaintiffs. The defendant

has pleaded in abatement; and says that the allegations of the affidavit are not true, and the court finds the plea to be sustained by the proof; and by that test the plaintiff's case, under our law, must fail. And it is right that a plaintiff who proceeds in this extraordinary way, before his debt is due, to attach his debtor for alleged fraudulent conduct, shall be required to prove that fraud; and the courts should protect merchants acting honestly against an abuse of the attachment laws, as well as their creditors against all fraudulent contrivances to cheat them. The attachment laws should be intelligently administered by the courts to prevent, on the one hand, fraudulent practices, and, on the other, oppressive and eager greed for a preference, inconsiderate distrust, and unwarranted interference with a merchant's business actions that are honest, even if not satisfactory to his creditors.

Dismiss the attachment, at plaintiffs' cost.

Upon the presentation of the decree in this case the plaintiffs' counsel objected to so much of it as required the fund of $2,200 to be paid over to the defendant, upon the ground that there were other attachment suits pending in the state court, instituted immediately after this case, which was the first; that the writs were successively levied upon the stock of goods, which were sold by the receiver, and a joint fund realized in his hands; that the levies were liens on the fund, and this prior lien having failed, by the judgment dismissing the bill in this court, leaves the liens of the other levies in force, and the fund should be returned to the state court. The record showed that at the time this suit was removed from the state court the whole fund was in the hands of the receiver of that court, and he was ordered by the chancellor to pass his accounts, and, after the allowances made to him, he was directed to retain in his hands $2,200 to answer the demands of this case, which had been removed to this court, and to pay over the balance to the clerk and master of that court, which was done accordingly.

The court holds that, under the removal acts, the receiver and the fund came with the case to this court, and stood for all purposes just as if the suit had been originally commenced here, and $2,200 of Jones' stock had been attached by the process of this court; that, as this case was the first that had been levied, the fund accumulated by that writ had been segregated by the removal, and left in the hands of the receiver of *this* court, the state court receiver becoming such *ipso facto,*—by the mere act of removal itself; that the subsequent attachments did not operate as a lien on the fund which the plaintiffs here had previously attached, the case standing in all respects as if originally commenced here, under the very language of the removal acts; and therefore there could be no lien on this fund in this court in favor of subsequent attachments in another court, however it might have been if the removed case had been one of the later levies, instead of the first one made. Rev. St. 639; Act 1875, *c.* 137, § 3; 18 St. 471; Rev. St. 646; Act 1875, *c.* 137, § 4; 18 St. 471; Supp. Rev. St. 174, 175; Thach. Pr. Cir. Ct. 295. But since the chancellor, in dealing with the fund, could not definitely determine

the exact amount belonging alone to this case, nor to any one of the other cases, until distribution should be made, he fixed upon the sum of $2,200 "to answer the contingencies of that case," which would be at most only the debt of Mack, Stadler & Co., the interest due upon it, and the costs, and, if so much as the chancellor set aside for this cause should be larger than would answer those demands, the balance would belong to the next attachment in order, and not to this case, and should be by the receiver paid into the hands of the clerk and master of the state court, under the chancellor's order, and not to the defendant, under the order of this court. Therefore, as Mack, Stadler & Co. had recovered no costs, but have costs to pay here, under this decree, nothing more should be retained by the receiver than the amount of their debt and interest, the balance in his hands going to the chancery court under the chancellor's decree. So ordered.